# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 29, 2010         Decided July 1, 2011

No. 08-5088

NEILAND COHEN,
APPELLANT

v.

UNITED STATES OF AMERICA,
APPELLEE

———

Consolidated with 08-5093, 08-5174

———

Appeals from the United States District Court
for the District of Columbia
(Nos. 1:07-cv-00051, 06–cv–00483, 07–cv–00050)

———

On Petition for Rehearing En Banc

———

*Thomas Goldstein* argued the cause for appellants. With him on the briefs were *Isaac J. Lidsky*, *Michael A. Bowen*, *Marc B. Dorfman*, *Jonathan W. Cuneo*, *Robert J. Cynkar*, *William H. Anderson*, *Nicholas E. Chimicles*, *Benjamin F. Johns*, *Henry D. Levine*, *Charles Tiefer*, *Mark C. Rifkin*, *Mark Griffin*, and *Randy J. Hart*.

*Kristin E. Hickman* was on the brief of *amicus curiae* in support of appellants.

*Gilbert S. Rothenberg*, Acting Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *Ronald C. Machen, Jr.*, U.S. Attorney, and *Teresa E. McLaughlin* and *Ellen P. DelSole*, Attorneys. *Kathleen E. Lyon*, Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

Before: SENTELLE, *Chief Judge*, GINSBURG, HENDERSON, ROGERS, TATEL, GARLAND, BROWN, GRIFFITH, AND KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH, with whom *Chief Judge* SENTELLE and *Circuit Judge* HENDERSON join.

BROWN, *Circuit Judge*: After illegally collecting a three percent excise tax, the Internal Revenue Service ("IRS" or "the Service") created a refund procedure for taxpayers to recoup their money. That procedure, Appellants argue, is unlawful. We have no occasion to visit the merits of Appellants' claims, as we granted rehearing en banc only to determine whether we have the authority to hear the case. We do.

3

I[1]

The Internal Revenue Code imposes a three percent excise tax on phone calls. 26 U.S.C. § 4251. Telephone service providers collect the tax and pay it over to the IRS. *See id.* § 4291. Individual taxpayers are not required to calculate their own excise tax liability or to maintain adequate supporting documentation to do so. *See* Rev. Rul. 60-58, 1960-1 C.B. 638. The Code taxes communications charges that are based upon distance and transmission time. 26 U.S.C. § 4252(b). Decades ago, these requirements posed no problem, as phone companies based their billing on multiple factors, including the key components of distance and time. *Nat'l R.R. Passenger v. United States*, 431 F.3d 374, 375 (D.C. Cir. 2005). The telecommunications revolution has changed all that. Many consumers now pay strictly based on transmission time; frequently, rates no longer vary based on the distance of a call. *Id.* Despite recognizing this shift, the IRS continued to collect taxes on all long-distance communications. *See* I.R.S. Notice 2005-79, 2005-2 C.B. 952 ("Notice 2005-79"); *see also* Rev. Rul. 79-404, 1979-2 C.B. 382 (determining communication between ships at sea or other offshore facilities and telephone subscribers in the United States were subject to the excise tax though the charges varied only based on transmission time).

Multiple corporate taxpayers brought refund suits claiming the excise tax was illegal and several circuits, including this one, concluded time-only rate structures render calls nontaxable under the Code. *Nat'l R.R. Passenger*,

---

[1] The panel decision, *Cohen v. United States*, 578 F.3d 1, 3–4 (D.C. Cir. 2009), sets out much of the relevant factual and procedural background of this case. We draw, often verbatim, from that decision in summarizing the background here.

431 F.3d at 375–76. While these lawsuits proceeded, the IRS remained adamant regarding the continuing applicability of the excise tax. After it lost an appeal in the Eleventh Circuit, *see Am. Bankers Ins. Group v. United States*, 408 F.3d 1328 (11th Cir. 2005), the Service declared it would continue to litigate the applicability of the tax and directed phone service providers to continue collecting the tax, even from individuals in the Eleventh Circuit's jurisdiction. Notice 2005-79. The IRS further ordered taxpayers to continue paying the tax, but permitted place-holder refund claims "for overpayments." *Id.* Taxpayers were advised, however, the Service would not process place-holder refund claims while related cases remained pending in federal courts of appeals. *Id.*

The IRS lost in each of the five circuits that considered its application of § 4251. All held the tax inapplicable to long-distance rates calculated without reference to distance. *Reese Bros., Inc. v. United States*, 447 F.3d 229, 231 (3d Cir. 2006); *Fortis, Inc. v. United States*, 447 F.3d 190, 191 (2d Cir. 2006); *Nat'l R.R. Passenger*, 431 F.3d at 374; *OfficeMax, Inc. v. United States*, 428 F.3d 583, 585 (6th Cir. 2005); *Am. Bankers Ins. Group*, 408 F.3d at 1338. On May 26, 2006, after the last of these rulings came down, the IRS issued Notice 2006-50, discontinuing the excise tax for phone charges based solely on transmission time. *See* I.R.S. Notice 2006-50, 2006-1 C.B. 1141 ("Notice 2006-50").[2]

Notice 2006-50 provided a one-time exclusive mechanism for taxpayers to obtain a refund for excise taxes erroneously collected between February 28, 2003, and August 1, 2006.[3]

---

[2] The IRS modified Notice 2006-50 on January 29, 2007. *See* I.R.S. Notice 2007-11, 2007-1 C.B. 405 ("Notice 2007-11").

[3] The IRS promulgated a different procedure for business entities (as opposed to individuals) seeking an excise tax refund. *See* Notice

*Id.* § 5(a) (agreeing to provide refund "if the taxpayer requests the credit or refund in the manner prescribed in this notice"); *id.* § 5(g) (refusing to process refund requests "that do not follow the provisions of this notice"). Although the IRS collected the excise tax through telephone service providers, Notice 2006-50 required individual taxpayers to request a refund on their 2006 federal income tax returns. *Id.* § 5(a)(2). Taxpayers who otherwise did not need to file income tax returns nevertheless had to file a return in order to submit a refund request. *Id.* Taxpayers could request either a "safe harbor" amount, which required no documentation, or the actual amount of tax they paid, for which the IRS could demand documentation.[4] *Id.* § 5(c); Notice 2007-11, § 11 (setting the safe harbor at between $30 and $60 depending on the number of exemptions and refusing to require telephone

---

2007-11. Enities could use the "Business and Nonprofit Estimation Method" formula to calculate their refund, or gather all their phone records during the refund period instead. *See id.* § 12.

[4] Notice 2006-50 ultimately proved an ineffective means of refunding the excise tax. According to a report issued by the Treasury Inspector General for Tax Administration, the IRS illegally collected approximately $8 billion between February 28, 2003, and August 1, 2006. TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REPORT NO. 2007-30-178, ALTHOUGH STRONG EFFORTS WERE MADE, A SIGNIFICANT AMOUNT OF THE TELEPHONE EXCISE TAX OVERCOLLECTED FROM INDIVIDUAL TAXPAYERS MAY NEVER BE REFUNDED 6 (Sept. 26, 2007). But the IRS only refunded "just over half" that amount, *id.* at 5 n.3, as only 1.7 percent of the 10 to 30 million eligible individuals without income tax filling obligations actually sought a refund. U.S. GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-695, TAX ADMINISTRATION: TELEPHONE EXCISE TAX REFUND REQUESTS ARE FEWER THAN PROJECTED AND HAVE HAD MINIMAL IMPACT ON IRS SERVICES 10 (2007).

companies to supply customers with billing records during the refund period).

Various lawsuits challenged the lawfulness and adequacy of the refund process. *See In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 469 F. Supp. 2d 1348 (J.P.M.L. 2006) (Transfer Order). The Multidistrict Litigation ("MDL") Panel consolidated and transferred three district court cases, *Cohen*, *Sloan*, and *Gurrola* into an MDL proceeding before the United States District Court for the District of Columbia. *Id.* at 1350. In each of the three consolidated suits, Appellants purported to represent a class of taxpayers who lacked the resources or expertise necessary to individually seek a refund under Notice 2006-50, or amounts at stake sufficient to make individual actions worthwhile.[5] Appellants claim Notice 2006-50 is substantively flawed because it undercompensates many taxpayers for the actual excise taxes paid and is procedurally flawed because the IRS did not comply with the notice and comment procedures required under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, when it issued the notice. *See* Second Amended Complaint ¶ 2 ("The I.R.S.'s program is unlawful because it fails to compensate consumers for anything approaching the full amount of the money illegally taken, is without a basis in law, is arbitrary in the extreme, and was promulgated without any of the procedures that are required to accompany agency rulemaking.").

The district court dismissed the cases after concluding Appellants failed to exhaust the administrative remedies for

---

[5] The three suits differ in one important respect. The *Cohen* plaintiffs separately filed a refund claim with the Service, which the district court dismissed as premature. Our panel decision affirmed the dismissal, *Cohen*, 578 F.3d 1, 14–15 (D.C. Cir. 2009), and that claim is not at issue here.

their refund claims and failed to state valid claims under federal law. *In re Long-Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 539 F. Supp. 2d 281, 287 (D.D.C. 2008) ("[N]o refund claim, no refund suit."). That court further found Notice 2006-50 was an "internal policy," did not adversely affect Appellants, and therefore constituted unreviewable agency action. *Id.*; s*ee* 5 U.S.C. § 702; *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (requiring "final agency action" to be the "consummation" of agency decisionmaking and either affect legal "rights or obligations" or result in "legal consequences"); *Trudeau v. FTC*¸456 F.3d 178, 185 (D.C. Cir. 2006) (explaining the "final agency action" requirement is not jurisdictional, but rather a limitation on an APA cause of action). The district court also ruled Appellants' APA claims for injunctive and declaratory relief were mooted by the IRS's decision to discontinue the tax on time-based phone charges. 539 F. Supp. 2d at 287.

A divided panel of this court reversed, holding Notice 2006-50 constituted final agency action reviewable under the APA. *Cohen*, 578 F.3d 1, 4–14 (D.C. Cir. 2009). Before doing so, the majority rejected two challenges to the court's jurisdiction. In the majority's view, neither the Anti-Injunction Act ("AIA"), which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person," 26 U.S.C. § 7421(a), nor the Declaratory Judgment Act ("DJA"), which authorizes declaratory relief except "with respect to Federal taxes," 28 U.S.C. § 2201(a), stripped the court of jurisdiction to hear Appellants' claims for equitable relief. *Cohen*, 578 F.3d at 5. Although the text of the AIA and DJA differ, the majority reasoned, our circuit precedent held the two "coterminous." *Id*. Thus, if one did not bar Appellants' APA claims, neither did the other. *Id.* at 13 (citing *"Americans. United," Inc. v. Walters*, 477 F.2d 1169, 1176 (D.C. Cir.

1973), *rev'd on other grounds sub nom. Alexander v. "Americans United" Inc.*, 416 U.S. 752 (1974) ("The breadth of the tax exception of [the DJA] is co-extensive with the effect of [the AIA], and so the applicability of the latter to our situation is determinative of jurisdiction.")).

The panel dissent, on the other hand, argued the DJA barred Appellants' APA claims. In the dissent's view, our precedent required the AIA and DJA to be read coterminously, but permitted us to select the broader of the two provisions as the baseline. As between the two, the dissent argued "reading the two statutes to coterminously bar declaratory and injunctive relief with respect to federal taxes is consistent with precedent, adheres to the plain text of the later-enacted [DJA], and corresponds to the well-established principle that challenges to tax regulations should be brought in refund suits." *Id.* at 18 (Kavanaugh, J., dissenting). The dissent also argued Appellants' claims were not ripe because Appellants had not filed refund requests under Notice 2006-50. *Id.* at 20 (citing *Stephenson v. Brady*, 927 F.2d 596 (table), 1991 U.S. App. LEXIS 2886, at *4 (4th Cir. 1991) (per curiam)).

On September 21, 2009, the IRS petitioned the court for rehearing en banc. We granted the petition, limiting our en banc review to four questions, all concerning (1) whether we have jurisdiction and (2) whether Appellants state a valid claim upon which relief may be granted. Our review is *de novo*. *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008).

II

We address jurisdiction first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). In that regard, two different questions are pertinent: Does section 10(a) of the

APA, 5 U.S.C. § 702, waive sovereign immunity with respect to Appellants' claims, and does the AIA, DJA, or both provide "other limitations on judicial review?"  5 U.S.C. § 702.

A

Our jurisdiction extends generally to cases and controversies involving questions of federal law.  28 U.S.C. § 1331.  The APA—a federal law—provides a "generic cause of action in favor of persons aggrieved by agency action," though it is not an independent source of jurisdiction.  *Md. Dep't of Human Res. v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1445 n.1 (D.C. Cir. 1985); *cf. Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 318 (D.C. Cir. 1988) ("Congress has seen fit to provide broadly for judicial review of those actions, affecting as they do the lives and liberties of the American people. This is fully in keeping with fundamental notions in our policy that the exercise of governmental power, as a general matter, should not go unchecked."); *Trudeau*, 456 F.3d at 183 ("[T]he APA does not afford an implied grant of subject matter jurisdiction permitting federal judicial review of agency action.") (quoting *Califano v. Sanders*, 430 U.S. 99, 107 (1977)).

In contrast, "[s]overeign immunity is jurisdictional" and "[a]bsent a waiver, . . . shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  Appellants, who seek only equitable relief, argue Congress provided the necessary waiver of immunity in § 702, which reads in part:

> An action in a court of the United States seeking relief other than money damages and stating a claim that an agency . . . acted or failed to act . . . shall not be dismissed nor relief therein be denied on the ground

that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. We agree. Even construing § 702 "strictly," as the Service requests, *see Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999), there is no doubt Congress lifted the bar of sovereign immunity in actions not seeking money damages. *See Trudeau*, 456 F.3d at 186. The IRS is not special in this regard; no exception exists shielding it—unlike the rest of the Federal Government—from suit under the APA. *See e.g.*, *Foodservice & Lodging Inst., v. Regan*, 809 F.2d 842 (D.C. Cir. 1987) (per curiam) (concluding the district court allowed under the APA a challenge to an IRS regulation unrelated to the assessment or collection of tax); *Tax Analysts & Advocates v. Shultz*, 376 F. Supp. 889, 892 (D.D.C. 1974) (invalidating a Revenue Ruling under the APA, *quoted approvingly in Hibbs v. Winn*, 542 U.S. 88, 103 (2004)); *Nat'l Restaurant Ass'n v. Simon*, 411 F. Supp. 993, 995–99 (D.D.C. 1976) (allowing a challenge to a Revenue Ruling to proceed under the APA).

The IRS insists § 702's waiver of sovereign immunity does not apply here because it does not encompass review of actions "committed to agency discretion." 5 U.S.C. § 701(a)(2). We previously rejected this argument when the Service couched it in terms of a want of "final agency action" under § 704, *see Cohen*, 578 F.3d at 7–10, and did not request briefing on the issue in our order granting en banc review. There is no need to revisit the issue now. Put simply, "Notice 2006-50 binds the IRS." *Cohen*, 578 F.3d at 8. Because the IRS "forfeited the discretion it retained prior to issuing the notice," *id.* at 8, we need not address whether the APA's "final agency action" requirement limits its waiver of sovereign immunity. In any event, we have previously held it did not. *Trudeau,* 456 F.3d at 187 ("We also hold that the waiver

applies regardless of whether the FTC's press release constitutes 'final agency action.'").

B

Even though § 702 waives the Government's immunity, it preserves "other limitations on judicial review" and does not "confer[] authority to grant relief if any other statute . . . expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see Schnapper v. Foley*, 667 F.2d 102, 108 (D.C. Cir. 1981) (stating the Government's immunity remains intact when "another statute expressly or implicitly forecloses injunctive [or declaratory] relief"); *Smith v. Booth*, 823 F.2d 94, 97 (5th Cir. 1987) (same); *Fostvedt v. United States*, 978 F.2d 1201, 1204 (10th Cir. 1992) (same); *see also* H.R. REP. NO. 94-1656, at 12, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6132–33 (stating that § 702 of the APA is to have no effect on limitations and prohibition of the AIA and DJA). The IRS argues the AIA and DJA provide such "other limitations" on our review. At the en banc stage, we may "set aside [our] own precedent" reading the two statutes as coterminous. *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 876 (D.C. Cir. 1992); *see also id.* at 880 (Randolph, J., concurring) (noting *stare decisis* is "most compelling" in cases of statutory interpretation) (quoting *Hilton v. S.C. Pub. Rys. Comm'n¸* 502 U.S. 197, 205 (1991)). We therefore address separately whether each statute limits judicial review under the APA.

The dissent suggests these questions of statutory interpretation are academic. Diss. Op. at 17 n.12. But this statement is puzzling. These questions are the same ones the dissent raised at the panel stage, the same questions the court granted en banc review to consider, and the same questions the court asked the litigants to address. The court did not grant en banc review to reconsider whether this case was ripe, or

whether Appellants failed to exhaust their administrative remedies.

1

Enacted in 1867, the AIA "apparently has no recorded legislative history, but its language could scarcely be more explicit." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (footnote omitted). It states:

> [N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

26 U.S.C. § 7421(a). "The manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to the disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Nav. Co.*, 370 U.S. 1, 7 (1962) (interpreting AIA by looking at "comparable" Tax Injunction Act ("TIA") of 1937, 50 Stat. 738 (codified as amended at 28 U.S.C. § 1341)). As the Supreme Court explained, the provision reflected "appropriate concern about the . . . danger that a multitude of spurious suits, or even suits with possible merit, would so interrupt the free flow of revenues as to jeopardize the Nation's fiscal stability." *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 769 (1974) (Blackmun, J., dissenting); *see also California v. Grace Brethren Church*, 457 U.S. 393, 410 (1982) (interpreting TIA).

The AIA has "almost literal effect": It prohibits only those suits seeking to restrain the assessment or collection of taxes. *Bob Jones*, 416 U.S. at 737 (quoting *Williams Packing*, 370

U.S. at 6-7) [6]; *see also Hibbs*, 542 U.S. at 102–03. Thus, in a late nineteenth century case, the AIA prohibited enjoining the collection of a tax on tobacco on the theory the tax was "illegally assessed." *Snyder v. Marks¸* 109 U.S. 189, 192–93 (1883); *see also Hannewinkle v. City of Georgetown*, 82 U.S. 547, 548 (1872). Similarly, in *Bob Jones University v. Simon*, the AIA precluded injunctive relief when Bob Jones University lost its status as a tax exempt organization under § 501(c)(3) of the Internal Revenue Code. 416 U.S. at 739. An injunction would have impacted the university's future tax liability because § 501(c)(3) organizations are exempt from FICA (social security) and FUTA (unemployment) taxes. *Id.*; *see also "Americans United" Inc.*, 416 U.S. at 762 n.13 (holding a suit for injunctive relief barred by the AIA because "[s]o long as the imposition of a federal tax, without regard to its nature, follows from the Service's withdrawal of § 501(c)(3) status, [injunctive relief is barred and] a refund suit following the collection of that tax is an appropriate vehicle for litigating the legality of the Service's actions under § 501(c)(3)."). By contrast, in *Hibbs v. Winn*, Arizona taxpayers sought to invalidate an Arizona tax credit that allegedly supported parochial schools in violation of the Establishment Clause. 542 U.S. at 92. The Supreme Court allowed the state taxpayers' suit for declaratory and injunctive relief to proceed

---

[6] In *Williams Packing*, the Supreme Court recognized a narrow judicially created exception to the AIA's prohibition on injunctive relief: when "it is clear that [1] under no circumstances could the Government ultimately prevail, the central purpose of the Act is inapplicable and . . . [2] the attempted collection may be enjoined if equity jurisdiction otherwise exists." *Williams Packing*, 370 U.S. at 7. *South Carolina v. Regan* provides a similar escape valve in the absence of an alternative remedy. 465 U.S. 367, 374 (1984). Because we hold the AIA does not preclude Appellants' claims, there is no need to inquire whether an exception to the AIA would apply if it did.

14

despite the comparable TIA because the suit did not alter the taxpayers' individual tax liability or deplete the state's tax revenue in any way. *See id.* at 107.

This suit does not seek to restrain the assessment or collection of any tax. The IRS previously assessed and collected the excise tax at issue. The money is in the U.S. treasury; the legal right to it has been previously determined. As a result, this suit is similar to *Hibbs.* Hearing it—whatever its merit—will not obstruct the collection of revenue as in *Snyder*, alter Appellants' future tax liabilities as in *Bob Jones*,[7] or shift the risk of insolvency as the Court feared in *Grace Brethren Church.* This suit is strictly about the procedures under which the IRS will return taxpayers' money. In any event, whether the IRS's procedures are upheld or the Appellants succeed in forcing a different set of procedures, those procedures are not retroactive; they do not and cannot affect the assessment or collection of taxes after the fact.

But the IRS thinks otherwise. The Service argues the Court has construed the AIA to preclude suit in similar circumstances. In support, the Service points to *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1 (2008), and

---

[7] The IRS argues *Bob Jones*, and its companion case *Alexander v. "Americans United," Inc.*, support reading the AIA to preclude Appellants' claims because neither "directly involve[d] assessment or collection." This misconstrues the holding of *Bob Jones* and *"Americans United."* In both cases, the judicial relief requested would have impacted the litigants' future tax liability because only 501(c)(3) organizations are exempt from FICA and FUTA taxes. *Bob Jones*, 416 U.S. at 727–28. The Court emphasized this point in characterizing both *Bob Jones* and *"Americans United"* as pre-enforcement cases. *Id.* at 727 ("This case and [*"Americans United"*] involve . . . whether, prior to the assessment and collection of any tax, a court may enjoin the Service . . . .").

15

*United States v. Dalm*, 494 U.S. 596 (1990). But *Clintwood Elkhorn* and *Dalm* are distinguishable. The Court's focus in each was on how the AIA and § 7422(a), together, establish the statutory conditions upon which a taxpayer may bring a refund suit without interrupting the orderly assessment and collection of taxes. *Clintwood Elkhorn* and *Dalm* do not speak to suits outside the § 7422(a) refund process. *See Dalm*, 494 U.S. at 601.

The IRS envisions a world in which no challenge to its actions is ever outside the closed loop of its taxing authority. It argues assessment and collection are part of a "*single* mechanism" that ultimately determines the amount of revenue the Treasury retains. Because this suit will ultimately affect the money Treasury retains, the IRS argues, it involves "assessment and collection."[8] But the Supreme Court rejected this "single mechanism" theory of assessment and collection in *Hibbs*, choosing instead to define "assessment and collection" as is done in the Internal Revenue Code. "[A]ssessment" is not "synonymous with the entire plan of taxation," but rather with "the trigger for levy and collection efforts," 542 U.S. at 102, and "collection" is the actual imposition of a tax against a plaintiff, and does not concern third-parties trying to contest the validity of a tax or to stop its collection. *Id.* at 104. The assessment and collection in this case are long-since completed and no "single mechanism" theory will revive them.

---

[8] Furthermore, because the AIA strips the court of its authority to issue injunctive relief, the IRS's proposed reading of "assessment and collection" would also preclude equitable relief in § 7422(a) proceedings (i.e. refund suits), since a refund claim may ultimately alter the amount of revenue the Treasury retains. This result, however, is at odds with the Service's subsequent argument that Appellants could obtain the relief they sought in a refund suit. Oral Arg. 41.

The IRS has a third theory—this one structural rather than textual. The IRS argues, as did the dissent at the panel stage, that the AIA bars Appellants' APA claims because a complex regulatory scheme requires that "challenges to tax laws, regulations, decisions, or actions ordinarily be brought in refund suits after plaintiffs have sought a refund from, and exhausted their administrative remedies with, the IRS." *Cohen*, 578 F.3d at 17 (Kavanaugh, J., dissenting). But this neglects the nuance. The Supreme Court, this court, and other circuits have allowed challenges to tax laws outside the context of a 26 U.S.C. § 7422(a) proceeding (a refund suit). For example, in *South Carolina v. Regan*, the Supreme Court rejected the IRS's argument that, because a taxpayer could have filed a refund suit instead, the AIA prohibited a suit in which South Carolina challenged the constitutionality of a federal statute imposing restrictions on the state's issuance of bonds. 465 U.S. at 378. The Court concluded the AIA "was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *Id*. at 381. For reasons developed more fully below, a refund suit is not an "alternative avenue" here.

Similarly, this court has allowed constitutional claims against the IRS to go forward in the face of the AIA. Thus, in *We the People Foundation, Inc. v. United States*, we held the AIA "[b]y its terms," did not bar "a straight First Amendment Petition Clause claim," 485 F.3d 140, 143 (D.C. Cir. 2007) (Kavanaugh, J.), even though it did bar a tax collection claim "couched . . . in constitutional terms," *id.*; *see also, e.g*, *Foodservice & Lodging Inst.*, 809 F.2d at 846 n.10 (allowing APA challenge to IRS tip regulation). Contrary to the IRS's position here, *We the People* does not support reading the AIA to reach all disputes tangentially related to taxes. Quite the opposite. It requires a careful inquiry into the remedy sought, the statutory basis for that remedy, and any implication the

remedy may have on assessment and collection. This is in accord with the holdings of several other courts. *See, e.g.*, *Linn v. Chivatero*, 714 F.2d 1278 (5th Cir. 1983) (allowing Fourth Amendment claim against IRS for return of seized materials); *see also Tax Analysts & Advocates¸* 376 F. Supp. at 892 (allowing action to compel IRS to collect additional taxes); *McGlotten v. Connally*, 338 F. Supp. 448, 453–54 (D.D.C. 1972) (three judge court) (allowing challenge to IRS grants of income tax exemptions to discriminatory organizations). The principle the case law elucidates is therefore quite simple: The AIA, as its plain text states, bars suits concerning the "assessment or collection of any tax." It is no obstacle to other claims seeking to enjoin the IRS, regardless of any attenuated connection to the broader regulatory scheme. As Appellants' suit does not implicate assessment or collection, the AIA does not apply.

2

Having established our authority to hear Appellants' claim for injunctive relief, we pause to consider whether it is necessary, or prudent, to wander further. Appellants claim not to care about the declaratory relief they seek, as it may become academic if they succeed in enjoining the IRS. Even so, Appellants refuse to waive the argument. Admittedly, it is odd "to think that a court with authority to issue [an injunction] is without power to declare the rights of the parties in connection therewith." *Tomlinson v. Smith*, 128 F.2d 808 (7th Cir. 1942). Nevertheless, establishing our jurisdiction over Appellants' claim for declaratory relief is not an academic exercise. Appellants do not abandon their claim and the DJA is a distinct grant of judicial authority, separate and apart from the court's power to award injunctive relief under 28 U.S.C. § 1331. Moreover, if the district court determines an injunction is not warranted on remand, questions about its

jurisdiction to hear Appellants' claim for declaratory relief will unnecessarily prolong the case even further. We therefore venture onward, and consider whether the DJA is an "other limitation[] on judicial review," 5 U.S.C. § 702, precluding the court's power to award Appellants the declaratory relief they seek.

As before, our inquiry begins with the statutory text. Unlike the AIA, the DJA seems to carve out of its ambit any suit "with respect to Federal taxes." 28 U.S.C. § 2201(a). But precedent interprets the DJA and AIA as coterminous. *See E. Kentucky Welfare Rights Org. v. Simon*, 506 F.2d 1278, 1284 (D.C. Cir. 1974); *"Am. United," Inc.*, 477 F.2d at 1176. In other words, "with respect to Federal taxes" means "with respect to the assessment or collection of taxes." This interpretation is consistent with law in several other circuits. *See United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 583–84 (4th Cir. 1996); *Ecclesiastical Order of ISM of AM v. IRS*, 725 F.2d 398, 404–05 (6th Cir. 1984); *Perlowin v. Sassi*, 711 F.2d 910, 911 (9th Cir. 1983) (per curiam); *McCabe v. Alexander*, 526 F.2d 963 (5th Cir. 1976) (per curiam); *Tomlinson*, 128 F.2d at 811.

The panel dissent read things differently. While acknowledging our prior interpretation of the AIA and DJA as coterminous, the dissent questioned such cases' precedential value, and wondered why a coterminous reading of the two statutes narrowed the scope of the DJA rather than broadening the scope of the AIA. *Cohen*, 578 F.3d at 18. Favoring the latter, the dissent concluded the text of the DJA (and deductively that of the AIA) "squarely precludes this APA suit at this time." *Id.* at 17. But the dissent went further, suggesting our precedent stemmed from a different and unruly era in which judges viewed statutory text not as an analytic starting point, but as a necessary formality in crafting opinions.

To remedy this, the dissent urged the "en banc Court [to] clear this up," "pay greater attention to statutory text," and "not find [the AIA and DJA] coterminous." *Id.* at 19 n.6.

So is Appellants' APA challenge properly characterized as a suit "with respect to Federal taxes"? It is in the sense the action is against the IRS, the agency charged with administering our federal tax system, and concerns refund procedures for a previously collected federal tax. This suit eludes that characterization in the sense its result—regardless of who wins—will not directly affect the disposition of any federal tax. Even if Appellants win, it does not follow that they are entitled to a tax refund. Whatever Appellants ultimately hope to achieve, this is not a refund suit. The IRS may still adopt a new version of the same notice after fixing any substantive and procedural defects. Which scope of "with respect to Federal taxes" is correct then—the broad one or the narrow one?

Despite our obligation to begin with the statutory text, discerning our jurisdiction to hear Appellants' request for declaratory relief must come not from staring hard at the phrase "with respect to Federal taxes," but from its context—linguistic, historical, and functional. A fuller consideration of the phrase reveals that both "actions brought under section 7428 of the Internal Revenue Code of 1986, [and] a proceeding under section 505 or 1146 of title 11," are outside the tax exception. 28 U.S.C. § 2201(a). To oust the courts of jurisdiction, it is not enough that claims relate in the loose sense to "Federal taxes"; they must also not pertain to the status and classification of section 501(c)(3) organizations (*i.e.*, 26 U.S.C. § 7428 proceedings), unpaid tax liability of the debtor in a Chapter 11 reorganization (*i.e.*, 11 U.S.C. § 505 proceedings), or the tax effects of a Chapter 11 reorganization plan if not obtained from the IRS within 270 days (*i.e.*, 11

U.S.C. § 1146 proceedings). These carve outs are notable: first, because they cabin the phrase "with respect to Federal taxes," thus implying an all-encompassing reading is inappropriate, and second, because each relates to tax assessment or collection, thus suggesting the term "Federal taxes" similarly pertains to assessment or collection.

The earliest cases construing the DJA's tax exception also rejected a broad construction of the statute. In *Tomlinson v. Smith*, 128 F.2d 808 (7th Cir. 1942), for example, the IRS sought to collect a partnership's taxes from the owners of a property leased by the partnership. The property's trustee sued the IRS in federal court seeking declaratory relief concerning title to the debt. The IRS argued the court was precluded by the DJA from declaring the parties' rights concerning the property, because the action related to federal taxes and impinged on the Service's collection efforts. On appeal from entry of an interlocutory injunction, the court determined the matter was appropriate for injunctive relief under a previous version of the AIA[9] because "plaintiff is not the alleged tax debtor" and "sues in the capacity of a trustee for the purpose of protecting the mortgage lien on property" the IRS was encumbering to extract taxes owed by the partnership. *Id.* at 810–11. The court then considered whether declaratory relief was barred by the DJA, and concluded:

> It is unreasonable to think that a court with authority to issue a restraining order is without power to declare the rights of the parties in connection therewith. In other words, *it is our view that the language which excepts federal taxes from the Declaratory Judgment*

---

[9] Congress subsequently amended the AIA to preclude suits by third-party property holders. Federal Tax Lien Act of 1966, Pub. L. No. 89-719, § 110, 80 Stat. 1125, 1144.

> *Act is co-extensive with that which precludes the maintenance of a suit for the purpose of restraining the assessment or collection of a tax.*

*Id*. (emphasis added).

The Second Circuit relied on *Tomlinson* in a 1962 decision involving similar facts. *Bullock v. Latham*, 306 F.2d 45, 47 (2d Cir. 1962). Although *Bullock v. Latham* did not explicitly hold the AIA and DJA were co-extensive, it quoted *Tomlinson*'s determination that the court's ability to provide injunctive relief was "determinative of its jurisdiction" to provide declaratory relief. *Id.* at 47. *Bullock* thus follows *Tomlinson* by reading the DJA's federal tax exemption narrowly. It applies to "controversies involving tax liabilities of parties qua taxpayers," but not all conceivable controversies relating to Federal taxes, even those altering the Service's ability to assess and collect. *Id.* at 48.

Congress did not intend to provide declaratory relief for litigants when the AIA barred injunctive relief. Holding to the contrary, as the IRS urges, would vitiate the structural design of the DJA. The legislative history speaks directly to this point. A year after passing the DJA, in § 405 of the Revenue Act of 1935, Congress amended the statute to expressly except disputes "with respect to Federal taxes." The Senate Finance Committee Report explained the animating purpose of the amendment, noting "[t]he application of the Declaratory Judgments Act to taxes would constitute a radical departure from the long-continued policy of Congress (as expressed in [the AIA] and other provisions) with respect to the *determination, assessment, and collection* of Federal taxes." S. REP. NO. 74-1240, at 11 (1935) (emphasis added).

When reading the legislative history, the Supreme Court declared: "[i]t is clear enough that one 'radical departure' which was averted by the amendment was the potential circumvention of the 'pay first and litigate later' rule by way of suits for declaratory judgments in tax cases." *Flora v. United States*, 362 U.S. 145, 165 (1960). By design, the DJA tax exception serves a critical but limited purpose. It strips courts of jurisdiction to circumvent the AIA by providing declaratory relief in cases "restraining the assessment or collection of any tax." 28 U.S.C. § 2201(a). Our prior case law—that from another era—also acknowledged the instructive role the DJA's legislative history plays in its construction. *See, e.g., E. Ky. Welfare Rights Org.*, 506 F.2d at 1285 n.11 (citing examples of 1935 cases attempting to circumvent the prohibitions of the AIA by using the DJA); *"Americans United" Inc.*, 477 F.2d at 1176. The same is true of the first court to describe the DJA as "coterminous," *see McGlotten*, 338 F. Supp. at 453 n.22, as well as other circuits to consider the issue, *see, e.g.*, *In re Leckie Smokeless Coal Co.*, 99 F.3d at 585; *Ecclesiastical Order of ISM of AM*, 725 F.2d at 405.

Of course, "it is the enacted text rather than the unenacted legislative history that prevails." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Mayflower Transit, LLC*, 615 F.3d 790, 792 (7th Cir. 2010) (Easterbrook, J.). "Legislative history—what would in contract interpretation be called extrinsic ambiguity—does not justify revising a text that has no intrinsic ambiguity or any difficulty in application." *Id.* Here, "with respect to Federal taxes" is intrinsically ambiguous. It does not bar all suits against the IRS, and thus does not encompass everything conceivably "with respect to Federal taxes." Having eliminated this broad interpretive gloss, what is and is not "with respect to Federal taxes" is left a mystery, with no great direction from the statutory text. Although we have questioned the utility of relying on

legislative history, *see, e.g.*, *Block v. Meese*, 793 F.2d 1303, 1309–10 (D.C. Cir. 1986) (Scalia, J.), the legislative history of the DJA is quite small—a single paragraph—and surprisingly straightforward.  It bears repeating: "Your committee believes that the orderly and prompt *determination and collection* of Federal taxes should not be interfered with." S. REP. NO. 74-1240, at 11 (1935) (emphasis added).

Finally, a functional concern exists with construing the DJA's exception to bar relief otherwise allowed under the AIA. The court would have jurisdiction to enjoin the parties appearing before it, but not to declare their rights.  This defies common sense, however, "since an injunction of a tax and a judicial declaration that a tax is illegal have the same prohibitory effect on the federal government's ability to assess and collect taxes."  *Bentsen*, 82 F.3d at 933.  A non-coterminous reading of the two statutes thus poses an insurmountable obstacle.  The court would not have jurisdiction to provide declaratory relief but could effectively do so anyway.

The Supreme Court suggested an answer to this riddle in *Hibbs*.  Recall, Arizona taxpayers challenged the constitutionality of an Arizona statute permitting tax credits for contributions to Arizona parochial schools.  542 U.S. at 92. To determine whether jurisdiction existed, the Court had to interpret the Tax Injunction Act (TIA), 28 U.S.C. § 1341.  The TIA, "modeled" after the AIA, *id.* at 102, "shields state tax collections from federal-court restraints," *id.* at 104.  Before beginning its interpretive quest, the Court "identif[ied] the relief sought."  *Id.* at 99.  As Appellants do here, the Arizona taxpayers sought both an injunction and a declaratory judgment.  *Id.*  Rather than bifurcate the inquiry, however, as we do here, the Court classified the requested remedies as a single form of relief—"prospective relief only."  *Id.*

("Respondents seek prospective relief only. Specifically, their complaint requests 'injunctive relief . . . .' Complaint 7, App. 15. . . . [,] a 'declaration . . . .' *Ibid.* [and] '[a]n order . . . .' Complaint 7-8, App. 15."); *see also Grace Brethren Church*, 457 U.S. at 408 ("[T]here is little practical difference between injunctive and declaratory relief.").

A coterminous reading of the DJA and the AIA makes sense in light of *Hibbs*, which construed the relief Appellants seek in the singular, as equitable relief, and not separately, as an injunction and declaratory judgment. In this light, the case is greatly simplified. The DJA falls out of the picture because the scope of relief available under the DJA is subsumed by the broader injunctive relief available under the AIA.

But what to make of the bugle sounding the textualist battle cry? It is true, the AIA and DJA use different words. But this observation does not beget a certain interpretive result. A baker who receives an order for "six" donuts and another for "half-a-dozen" does not assume the terms are requests for different quantities of donuts. Similarly, a man does not receive different directions to Dupont Circle if he is told by one person to "take the Metro" and by another to "catch the Red Line." What the AIA accomplishes by denying its application to "any suit for the purpose of restraining the assessment or collection of any tax" the DJA accomplishes by an exception "with respect to Federal taxes." By nature, language is simultaneously robust and precise. Different verbal formulations can, and sometimes do, mean the same thing.

In sum, we hold that APA § 702's waiver of sovereign immunity permits Appellants' APA cause of action and neither the AIA nor DJA otherwise limits our review.

III

We now consider whether Appellants state a valid cause of action. Under § 704, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."[10] 5 U.S.C. § 704. The IRS argues, and Appellants concede, if an adequate remedy at law exists, equitable relief is not available under the APA.

The IRS and the dissenting opinion contend § 7422(a) of the Internal Revenue Code, the refund suit mechanism, provides Appellants the relief they seek.[11] That provision bars any lawsuit for recovery of excessive or wrongfully collected taxes "until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof." 26 U.S.C. § 7422(a).

At first blush, § 7422(a) does not apply. This is not a suit "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected." *Id.* Even if Appellants are entirely successful, they cannot recover the wrongfully assessed tax unless they follow whatever new

---

[10] Section 704 "is not a jurisdiction-conferring statute." *Trudeau*, 456 F.3d at 183; *see also Micei Int'l. v. Dep't. of Commerce*, 613 F.3d 1147, 1152 (D.C. Cir. 2010); *Oryszak v. Sullivan*, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009).

[11] To clarify, although 28 U.S.C. § 1346(a)(1) grants concurrent jurisdiction to district courts and the Court of Federal Claims, the Code speaks of refund suits as those filed "under section 7422(a)," 26 U.S.C. § 6532, and "filed with the Secretary," *id.* § 7422(a).

administrative procedures the IRS decides to implement.[12] This suit is an APA action; it questions the administrative procedures by which the IRS allows taxpayers to request refunds for the wrongfully collected excise tax. Moreover, § 7422(a) would not provide Appellants the equitable relief they seek. Section 7422(a) provides "for the recovery of any internal revenue tax." *Id.* It does not, at least explicitly, allow for prospective relief. The Service itself unknowingly concedes this point, as it believes the AIA and DJA preclude equitable remedies outside of a refund suit and is agnostic concerning the availability of broad equitable remedies as part of a refund suit. Apparently, even if § 7422(a) allowed for an injunction or declaratory judgment, the relief would be individualized, not class wide as Appellants seek. Each taxpayer would have to litigate separately the Service's use of Notice 2006-50. As the IRS explained at oral argument: "just because we lose in one court doesn't mean that we give up." Oral Arg. Tr. 39.

The dissent assumes a refund suit provides an adequate remedy at law. If this were the case, it is undisputed Appellants would have to proceed through Notice 2006-50. If adequate, Notice 2006-50 would render Appellants' claims unripe before they filed their refund actions. *See Full Value*

---

[12] The dissent argues Appellants' "objectives" are monetary: "billions of dollars in additional refunds" and a "class-wide jackpot." Diss. Op. at 2, 3. But this framing is misleading. Although Appellants may *ultimately* seek additional refunds if IRS Notice 2006-50 is invalidated and they succeed in substituting a more "effective" (and perhaps more fruitful) refund mechanism in its stead, Appellants' APA suit is a distinct part of their bifurcated litigation strategy. It offers no monetary relief, tax refund or otherwise. Furthermore, the IRS is no victim. And Appellants are not raiders in pursuit of an unwarranted windfall; they are aggrieved citizens in search of accountability.

*Advisors, LLC v. SEC*, No. 10-1053, slip op. at 9 (D.C. Cir. Feb. 4, 2011) ("[Petitioner's] failure to fully comply with the Commission's process (i.e. exhaust) has left some of its claims unfit for review (i.e. unripe) and that is perhaps not surprising given the two doctrines' common origins; they are both 'prudential doctrines' designed to 'respond to pragmatic concerns about the relationship between courts and agencies.'" (quoting *John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 567 (D.C. Cir. 2007))).

But the adequacy of Notice 2006-50 is the gravamen of Appellants' suit. Appellants claim Notice 2006-50 is unlawful, and therefore inadequate, because it was not subject to notice and comment rulemaking and is substantively unreasonable. As a result, Appellants argue they do not have to comply with Notice 2006-50 to challenge it. In support they cite *McCarthy v. Madigan*, a case where the Supreme Court cites several cases in which circumstances weighed against requiring administrative exhaustion. 503 U.S. 140, 147–49 (1992). In *Barry v. Barchi*, a horse trainer challenged a New York law allowing for summary suspension of his professional license without a presuspension hearing. 443 U.S. 55, 60–62 (1979). The Board suspended Barchi's license for fifteen days, a time period shorter than the thirty days in which the Board had to issue a final order. *Id.* at 59, 61. In *Gibson v. Berryhill*, a state board, composed entirely of members of the optometry association, sought to revoke the licenses of a small number of optometrists who worked for a corporation, a violation of the association's membership code. 411 U.S. 564, 567–68 (1973). The threatened optometrists argued the Board was unconstitutionally constituted. *Id.* at 569–70. Finally, in *McCarthy* itself, the Court declined to require exhaustion because the Court found "Congress ha[d] not meaningfully addressed the appropriateness of requiring exhaustion in this context" and the plaintiff's "individual

interests outweigh[ed] countervailing institutional interests favoring exhaustion." 503 U.S. at 149. The Court concluded: "exhaustion has not been required where the challenge is to the adequacy of the agency procedure itself, such that 'the question of the adequacy of the administrative remedy . . . [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit.'" *Id.* at 148 (quoting *Barchi*, 433 U.S. at 63).

This is precisely such a case. Congress has not required exhaustion in APA suits challenging the adequacy of IRS procedures, only in suits "for the recovery of any internal revenue tax." 26 U.S.C. § 7422(a). Although the cases from which the Court's synthesis is drawn are distinguishable on their facts, the animating principle is a perfect fit: it is "improper to impose an exhaustion requirement" when the allegation is that the "administrative remedy furnishes no effective remedy at all." *Id.* at 156 (Rehnquist, J., concurring in the judgment).

In sum, this suit is *sui generis*. Allowing Appellants to proceed without first filing a refund claim will not open the courthouse door to those wishing to avoid administrative exhaustion procedures in other cases. In the tax context, the only APA suits subject to review would be those cases pertaining to final agency action unrelated to tax assessment and collection. More broadly, litigants could not avoid exhaustion when challenging agency decisionmaking, because *McCarthy* and its progeny apply only when litigants challenge the exhaustion scheme itself. And once litigated, precedent would preclude later litigants challenging exhaustion procedures from relying on *McCarthy* in a court that had previously rejected the same argument.

The dissent argues Appellants fail to exhaust their claims under either § 703 or § 704 of the APA because a tax refund suit is an otherwise adequate procedure "for a taxpayer to wrangle with the IRS over taxes, refunds, or the legality of IRS tax collection or refund practices." Diss. Op. at 6. But this argument conflates the existence of an alternative remedy with an "adequate remedy." Even if equitable relief were possible in a § 7422 proceeding, it would be cold comfort to direct Appellants to proceed in a series of individual suits, submitting themselves one by one to the very refund procedures that they claim to be unlawful. The dissent suggests Appellants could avoid this inefficiency by winning a single case that would have preclusive effect across the nation. But the IRS has already shown itself unwilling to accept the binding effect of judicial opinions from one circuit to another, and the Supreme Court is highly unlikely to provide a nationwide decree because it rarely grants certiorari in an individual tax refund dispute. Another obstacle to Supreme Court review arises where, as here, the taxpayer wins at the appellate stage and is left with no avenue for seeking certiorari. *See Electr. Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 242 (1939) ("A party may not appeal from a judgment or decree in his favor . . . ."); *Camreta v. Greene*, -- S. Ct. --, 2011 WL 2039369, at \*2 (2011) ("As a matter of practice and prudence, we have generally declined to consider cases at the request of a prevailing party.") Furthermore, the cases upon which the dissent relies are inapposite. *Clintwood Elkhorn*, *Hibbs*, *"Americans United"*, and *Bob Jones* involved taxpayer challenges to the validity of an individual tax—paradigmatic refund suits. *See e.g.*, *Clintwood Elkhorn*, 553 U.S. at 4 (coal tax); *Hibbs*, 542 U.S. at 103–04 (parochial school tax credits). For example, *"Americans United"* and *Bob Jones Univ.* addressed corporations' status as § 501(c)(3) tax-exempt non-profit organizations. *See "Americans United" Inc.*, 416 U.S. at 762; *Bob Jones*, 416 U.S. at 746–47. None of the

cases involved a challenge to an IRS regulation, action, or procedure unrelated to the individual assessment or collection of taxes. *Cf. Foodservice & Lodging Inst.*, 809 F.2d at 846 n.10 (allowing APA challenge to IRS tip regulation without individual refund suits).

Finally, the dissent concocts an extravagant scenario in an effort to show that a refund suit would be an adequate alternative remedy. In the dissent's view, Appellants should have "skip[ped] the administrative process altogether and directly file[d] tax refund suits under 28 U.S.C. § 1346(a)(1)." Diss. Op. at 10. Then, in order to rebuff the IRS's inevitable motion to dismiss for failure to exhaust administrative remedies, the Appellants could assert that, under *McCarthy*, their lack of exhaustion is excusable because the IRS's administrative remedies are unreasonable and unlawful. *Id.*

The first problem is, as explained above, this is not a refund suit—Appellants are seeking equitable relief rather than "recovery of any internal revenue tax." 26 U.S.C. § 7422(a). Therefore allowing Appellants' APA suit to proceed does not "duplicate existing procedures for review of agency action." *Bowen v. Mass.*, 487 U.S. 879, 903 (1988). Indeed, allowing judicial review of Appellants' APA suit is consistent with the APA's underlying purpose—"remov[ing] obstacles to judicial review of agency action," *Id.* at 904 (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955),—and the proper construction of § 704, *Bowen*, 487 U.S. at 904 (rejecting a "restrictive" interpretation of § 704). Even putting that aside, however, the dissent's theory could contradict the language of § 7422, which states: "No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax . . . until a claim for refund or credit has been duly filed with the Secretary." This language seems not to make an exception for suits challenging the legality of administrative

procedures. Without deciding whether a *McCarthy*-based objection to exhaustion procedures is cognizable in a refund suit, we note that in *McCarthy* itself, "Congress ha[d] not meaningfully addressed the appropriateness of requiring exhaustion." 503 U.S. at 149. And for this reason, it is far from clear Appellants could challenge Notice 2006-50 in a refund suit without first having to proceed through it.

The dissent's defense of the IRS's prerogatives is ironic. The IRS promulgated Notice 2006-50 as a way to avoid thousands of successful corporate refund suits and to spare individuals, who—unlike their corporate counterparts—had no incentive to pursue costly litigation against the IRS. By promulgating the 2006 rule, the IRS effectively conceded a case-by-case resolution would be both inefficient and unfair. The moral of the dissent's story is that such remedies are now perfectly adequate.

## IV

The IRS argues this suit is not ripe because it is a "pre-enforcement" action. The aim of the ripeness doctrine is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano*, 430 U.S. 99 (1977). "The ripeness inquiry probes the fitness for review of the legal issue presented, along with (in at least some cases) 'the hardship to the parties of withholding court consideration.'" *Teva Pharm. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 (D.C. Cir. 2010) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808

(2003)); *see also Nat'l Park Hospitality Ass'n*, 538 U.S. at 807–08 (refusing to hear a pre-enforcement challenge because agency guidelines did not carry the force of law); *Unity08 v. Fed. Election Comm'n*, 596 F.3d 861, 865 (D.C. Cir. 2010) ("[A] claim that a challenge to an agency's final legal position must await an enforcement proceeding is analyzed under the ripeness doctrine's requirement[] that issues be fit for review . . . .") "This court has long understood the approach in *Abbott Labs* to incorporate a presumption of reviewability." *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005) (citing *Nat'l Automatic Laundry Cleaning Council v. Shultz*, 443 F.2d 689, 694 (D.C. Cir. 1971)); *see also Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) (quoting *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 757 (D.C. Cir. 2003)).

We rejected the Service's pre-enforcement argument at the panel stage and did not grant en banc review to reconsider it. The panel held this case was a *post*-enforcement action, and therefore fit for review, because Notice 2006-50 constituted final and reviewable agency action barring Appellants "from pursuing their refunds in court by virtue of the fact that they did not exhaust their administrative remedies under the only available avenue—Notice 2006-50." *Cohen*, 578 F.3d. at 6–13; *cf.*, *McGuirl v. United States*, 360 F. Supp. 2d 129, 132 (D.D.C. 2004) (reviewing post-enforcement challenge); *Nat'l Restaurant Ass'n*, 411 F. Supp. at 995–99; *Tax Analysts & Advocates*, 376 F. Supp. at 892, *quoted approvingly* in *Hibbs*, 542 U.S. at 103–04 & n.6.

The dissent tweaks this argument by describing this case as a "pre-application" challenge, rather than a "pre-enforcement" challenge. Diss. Op. at 17. Thus, the dissent shifts focus from the fitness of Notice 2006-50, which the dissent concedes, Diss. Op. at 12, to the alleged "benefit"

Appellants seek, i.e. the hardship inquiry. Diss. Op. at 15. But again, conceiving of Appellants as taxpayers looking for a handout is flawed. The APA does not offer any monetary award. Nor is the money the IRS wrongfully took a benefit the Service may choose (or not choose) to bestow upon Appellants, such as amnesty for undocumented immigrants, *see Reno v. Catholic Social Services*, 509 U.S. 43, 46 (1993), or a government certification, *see Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 161, 165 (1967).

The dissent argues any delay caused by filing individual refund claims would not "constitute [a] sufficient hardship." Diss. Op. at 13. But, in the context of APA challenges, we have previously said "[lack of] hardship cannot tip the balance against judicial review," *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 465 (D.C. Cir. 2006) (quoting *Nat'l Mining Ass'n*, 324 F.3d at 756–57) (alterations in original), "is largely irrelevant," *Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004), and "is not an independent requirement divorced from the consideration of the institutional interests of the court and agency," *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003). "[O]nce we have determined that an issue is clearly fit for review, there is no need to consider 'the hardship to the parties of withholding court consideration.'" *Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995) (quoting *Abbott Labs.*, 387 U.S. at 149). When the hardship Appellants suffer is compliance with allegedly unlawful administrative procedures, we have consistently held claims are ripe for review. *See Wyo. Outdoor Council v. U.S. Forest Service*, 165 F.3d 43, 51 (D.C. Cir. 1999) (dismissing NEPA claim as unripe but considering procedural claim); *Action for Children's Television*, 59 F.3d at 1258. Moreover, the Supreme Court implied the same in *Reno*—the case upon which the dissent primarily relies. *Reno*, 509 U.S. at 60–61

(distinguishing *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 487 (1991)).

The practical consequence of the dissent's ripeness argument is a judicially created exemption for the IRS from suit under the APA. There may be good policy reasons to exempt IRS action from judicial review. Revenue protection is one. *See Hibbs*, 542 U.S. at 104–05. But Congress has not made that call. *Cf.* 5 U.S.C. § 701(b)(1)(A)–(H) (stating exceptions to the APA's definition of "agency"); *Hibbs*, 542 U.S. at 105 ("Nowhere does the legislative history announce a sweeping congressional direction to prevent 'federal-court interference with all aspects of state tax administration.'"); *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991) (concluding, based on the legislative history of the APA, Congress "wanted to avoid a formalistic definition of 'agency'"). And we are in no position to usurp that choice on the basis of ripeness. *Cf. Mayo Found. for Med. Educ. & Res. v. United States*, 131 S. Ct. 704, 713 (2011) (noting in the context of tax regulations "the importance of maintaining a uniform approach to judicial review of administrative action" (quoting *Dickinson v. Zurko*, 527 U.S. 150, 154 (1999)).

V

The litigation position of the IRS throughout the history of the excise tax has been startling. But the taxpayers' response to Notice 2006-50 is not so shocking. After conceding the excise tax was collected illegally, the Service set up a virtual obstacle course for taxpayers to get their money back.

This suit is not about the excise tax, its assessessment, or its illegal collection. Nor is it about the money owed the taxpayers. This suit is about the obstacle course, and the decisions made by the IRS while setting it up. As a result, we

have federal question jurisdiction, and neither the AIA nor the DJA provide a limitation on our exercise of it. Because Appellants have no other adequate remedy at law, the district court should consider the merits of their APA claim on remand.

*So ordered.*

KAVANAUGH, *Circuit Judge*, with whom *Chief Judge* SENTELLE and *Circuit Judge* HENDERSON join, dissenting:

From 2003 to 2006, millions of Americans paid excessive taxes on long-distance telephone calls. In 2006, the Government announced that it would refund the overpaid taxes. In IRS Notice 2006-50 (in what we will refer to as the 2006 "refund rules"), the Government established a simple process for obtaining refunds. Taxpayers who wanted to claim a standard refund amount – ranging from $30 to $60 – could simply check a box on their 2006 income tax returns. Those who wished to claim an amount greater than the standard amount could file a Form 8913 with their 2006 income tax returns and itemize the refund due. And those who would not otherwise file a tax return for 2006 could file a newly created Form 1040EZ-T to claim the standard amount, and attach Form 8913 to claim an amount greater than the standard. Those who missed out when filing their 2006 tax returns could file – and even today, still can file – amended 2006 returns to claim the refund. Someone unsatisfied with the refund amount or with the IRS's refund rules could file a tax refund suit in district court or the Court of Federal Claims. *See* 28 U.S.C. § 1346(a)(1).

Approximately 90 million Americans followed those simple instructions and promptly received their refunds. As remedial government programs go, this one worked reasonably well.[1]

---

[1] The majority opinion suggests that the IRS's refund program didn't work well because the Government did not give refunds to people who did not request refunds. *See* Maj. Op. at 5 n.4. We find that an odd criticism. The IRS aggressively publicized the refund procedure so that people who were due refunds would know how to request them. Ninety million taxpayers managed to do so.

The ten individual plaintiffs in this case were aware of the 2006 refund rules. But so far as the record reveals, none of them chose any of the readily available alternatives for obtaining a refund. None checked the standard refund box on their 2006 tax returns. Nor did any file a Form 8913 with their 2006 tax returns to claim a refund amount greater than the standard refund. Nor did any file a Form 1040EZ-T. Nor did any file a tax refund suit to complain about the amount available from the IRS or the refund rules.

Instead, plaintiffs decided to up the ante. They filed a purported class-action lawsuit in U.S. District Court. Plaintiffs sued under the Administrative Procedure Act, claiming that the IRS's 2006 refund rules were promulgated without proper notice and that the refund scheme would not fully compensate them for their overpaid taxes. Plaintiffs seek declaratory and injunctive relief. They want a judicial declaration that the refund scheme is unlawful and an injunction ordering the Government to devise a new refund process so as to correct the alleged flaws.

The reader may wonder why plaintiffs didn't simply file the relevant forms with the IRS to get refunds, and if dissatisfied with the amounts they received or with the IRS's refund rules, bring individual tax refund suits. After all, each plaintiff could have raised complaints about the refund rules in such a case, and each plaintiff's litigation would have long since concluded by now. The answer seems to be that plaintiffs are litigating primarily on behalf of others, not themselves. Plaintiffs' ultimate objectives are class certification and a court order that the U.S. Government pay *billions* of dollars in additional refunds to millions of as-yet-unnamed individuals who never sought refunds from the IRS or filed tax refund suits. It seems that plaintiffs have deliberately avoided filing individual refund claims with the IRS and filing tax refund suits because they think they have a better chance of obtaining class certification if they don't take

those steps. And class certification is a necessary prerequisite to the class-wide jackpot plaintiffs are seeking here.

In any event, regardless of this case's unusual background and its potentially large effect on the U.S. Treasury, the present appeal raises only a straightforward legal question.

The issue, boiled down to its essentials, is whether plaintiffs can raise their objections to the 2006 refund rules in this APA suit – or instead must raise their claims in tax refund suits after first filing refund claims with the IRS. It is important to underscore that the fundamental issue here is timing: It concerns *when* plaintiffs can raise their objections to the 2006 refund rules in court, not *whether* plaintiffs can raise their objections to the 2006 refund rules in court.

For two alternative reasons, plaintiffs cannot maintain this APA suit. *First*, the APA itself bars this suit because plaintiffs have an adequate alternative judicial remedy, namely tax refund suits. *Second*, under the ripeness doctrine, plaintiffs must file refund claims with the IRS before bringing suit to challenge the 2006 refund rules. We will address each point in turn.

I

The Government contends that the Administrative Procedure Act itself bars plaintiffs from maintaining this APA suit. *See* Gov't Br. at 63. We agree. Under §§ 703 and 704 of the APA, plaintiffs cannot maintain this APA suit because they have an alternative congressionally specified judicial forum in which to pursue their complaints about the 2006 refund rules – namely, a tax refund suit.

The APA provides for judicial review of agency action. But the APA may not be invoked when Congress has

specified other judicial review procedures. Section 703 of the APA states: "The form of proceeding for judicial review is the *special statutory review proceeding relevant to the subject matter in a court specified by statute*," provided that the statutorily specified review proceeding is not "inadequa[te]." 5 U.S.C. § 703 (emphasis added). Relatedly, § 704 of the APA provides: "Agency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review." 5 U.S.C. § 704 (emphasis added).

For our purposes, both provisions make the same point: A party cannot bring a freestanding APA suit when Congress has specified a different judicial review procedure "relevant to the subject matter," so long as that congressionally specified review procedure is "adequate." *See, e.g.*, ATTORNEY GENERAL'S MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT 101 (1947) (describing adequate remedy under § 704 by cross-reference to § 703).[2]

As the Supreme Court has explained, the APA "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).[3]

---

[2] Those § 703 and § 704 requirements are related to a bedrock principle of the American legal system: Equitable relief is not available when there is an adequate remedy at law. *See* Judiciary Act of 1789, § 16, 1 Stat. 73, 82; *Bob Jones Univ. v. Simon*, 416 U.S. 725, 742 n.16 (1974) (referring to "the background of general equitable principles disfavoring the issuance of federal injunctions against taxes, absent clear proof that available remedies at law were inadequate"); *Richards v. Delta Airlines, Inc.*, 453 F.3d 525, 531 n.6 (D.C. Cir. 2006) ("The general rule is that injunctive relief will not issue when an adequate remedy at law exists.").

[3] Numerous cases have applied that principle. *See ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270, 282 (1987)

("Hobbs Act specifies the form of proceeding for judicial review of ICC orders," citing § 703); *Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 420 (1965) ("where Congress has provided statutory review procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive"); *Garcia v. Vilsack*, 563 F.3d 519, 523-25 (D.C. Cir. 2009) (discrimination suit against Department of Agriculture afforded an "adequate remedy in court" and thus precluded APA challenge); *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007) ("a challenge to an agency's refusal to comply with a Rule 45 subpoena should proceed and be treated not as an APA action but as a Rule 45 motion to compel," citing § 703); *Wright v. Dominguez*, No. 04-5055, 2004 WL 1636961, at *1 (D.C. Cir. 2004) (de novo district court review of decisions of Equal Employment Opportunity Commission precluded APA challenge to EEOC's procedures); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 750-51 (D.C. Cir. 1990) (individual private suits against institutions afforded adequate remedy to private parties alleging discrimination under Titles VI and IX; Court noted that "under our precedent, situation-specific litigation affords an adequate, even if imperfect, remedy"); *Coker v. Sullivan*, 902 F.2d 84, 89-90 (D.C. Cir. 1990) (judicial review of state administrative hearings and federal suit against offending states afforded adequate remedy in court to preclude APA suit seeking to compel the Department of Health and Human Services to enforce states' compliance with emergency assistance plans); *Cabais v. Egger*, 690 F.2d 234, 240-41 (D.C. Cir. 1982) (challenge to individual benefit reduction afforded "adequate remedy in court" to Social Security recipients seeking to challenge the Department of Labor's interpretation of a federal statute); *Nassar & Co. v. SEC*, 566 F.2d 790, 792 n.3 (D.C. Cir. 1977) (where there was statutory procedure for obtaining review of an SEC order, APA suit for declaratory judgment was barred); *Nader v. Volpe*, 466 F.2d 261, 266 (D.C. Cir. 1972) ("when Congress has specified a procedure for judicial review of administrative action, courts will not make nonstatutory remedies available without a showing of patent violation of agency authority or manifest infringement of substantial rights irremediable by the statutorily-prescribed method of review") (footnote omitted).

The Supreme Court has summarized the key principle in terms that are directly on point in this case: "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Id.*; *see also Darby v. Cisneros*, 509 U.S. 137, 146 (1993) ("Congress intended by [§ 704] simply to avoid duplicating previously established special statutory procedures for review of agency actions.").

Here, Congress has established a judicial procedure that, to use the terms of § 703, is "relevant to the subject matter" – namely, a tax refund suit. Section 1346(a)(1) of Title 28 provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws . . . .

As the Supreme Court and this Court have explained on many occasions, the tax refund suit is a statutorily designed judicial procedure for a taxpayer to wrangle with the IRS over taxes, refunds, or the legality of IRS tax collection or refund practices. *See generally United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4 (2008); *Hibbs v. Winn*, 542 U.S. 88, 103-04 (2004); *United States v. Williams*, 514 U.S. 527, 536 (1995); *Alexander v. "Americans United" Inc.*, 416 U.S. 752, 762 (1974); *Bob Jones Univ. v. Simon*, 416 U.S. 725, 746-47 (1974); *Inv. Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 9 (D.C. Cir. 1979).

The only remaining question is whether the tax refund suit is "adequate" here. It plainly is. In tax refund suits, plaintiffs and others similarly situated could obtain judicial review of their complaints about the 2006 refund rules. In such suits, plaintiffs could obtain the larger refunds they seek,[4] as well as appropriate injunctive or declaratory relief. *See South Carolina v. Regan*, 465 U.S. 367, 373-81 & 377-78 n.16 (1984); *Americans United*, 416 U.S. at 761-62; *Bob Jones*, 416 U.S. at 748 n.22.[5]

---

[4] Plaintiffs acknowledge that they ultimately want additional refunds of the taxes wrongly collected, in addition to equitable relief. Indeed, they would not have standing to challenge the 2006 refund rules unless they wanted additional refunds.

[5] In challenging the adequacy of tax refund suits, plaintiffs hint that declaratory and injunctive relief might be available only in APA suits, and not in tax refund suits. That is wrong; indeed, the Supreme Court has indicated just the opposite.

To begin with, the Declaratory Judgment Act bars declaratory relief "with respect to Federal taxes," 28 U.S.C. § 2201(a), and the Anti-Injunction Act bars injunctions "for the purpose of restraining the assessment or collection of any tax," 26 U.S.C. § 7421(a). By their terms, those statutory bars apply in APA suits as well as in tax refund suits. *See* 5 U.S.C. § 702 (preserving "other limitations on judicial review"). Therefore, if a taxpayer could obtain equitable relief in an APA suit, as plaintiffs here argue, the taxpayer could also obtain such relief in a tax refund suit. That point alone suffices to show that the tax refund suit is an adequate forum for plaintiffs to seek appropriate declaratory and injunctive relief.

In addition, precedent demonstrates that declaratory relief and injunctive relief are available in tax refund suits. The Supreme Court has indicated that injunctive relief is available in the tax context, despite the terms of the Anti-Injunction Act. *See South Carolina v. Regan*, 465 U.S. at 373-81 & 377-78 n.16; *Bob Jones*, 416 U.S. at 748 n.22. Moreover, the Supreme Court has suggested that injunctive relief would be available *only* in tax refund suits – and not in APA suits – where, as here, Congress has provided tax refund suits as "an alternative avenue for an aggrieved party to litigate its claims." *South Carolina v. Regan*, 465 U.S. at 381;

Because plaintiffs can raise their objections to the 2006 refund rules and obtain tax refunds and appropriate equitable relief in a tax refund suit, the tax refund suit is an adequate alternative judicial procedure.[6] The majority opinion seems to suggest that the tax refund suit is not adequate because the 2006 refund rules are alleged to be unlawful. *See* Maj. Op. at 27-28. That badly misstates the relevant issue. The merits of plaintiffs' claims are distinct from the adequacy of the specified judicial review procedure. The proper question here

*compare id.* at 373-81 & 377-78 n.16 (injunction available in non-tax-refund suit only because plaintiffs could not pursue tax refund suit) *with Bob Jones*, 416 U.S. at 748 & n.22 (injunction not available in APA suit because plaintiffs could pursue tax refund suit); s*ee also Americans United*, 416 U.S. at 761-62. The Supreme Court has not had occasion to expressly state that it would allow claims for declaratory relief in tax refund suits, although that presumably also would be permitted under the *South Carolina v. Regan*/*Americans United*/*Bob Jones* reasoning. After all, injunctive relief typically entails a declaration *plus* an order to do or refrain from doing something, meaning that declaratory relief is, in essence, a lesser-included version of injunctive relief. As plaintiffs rightly say, it would be "logically incoherent" and "nonsensical" to allow injunctive relief but forbid declaratory relief. *See* Cohen Br. at 22, 37; *see also California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982) ("there is little practical difference between injunctive and declaratory relief").

Finally, it bears mention that the Government has acknowledged that plaintiffs could obtain appropriate declaratory and injunctive relief in tax refund suits. *See* Tr. of Oral Arg. at 39-41.

[6] Even if there were somewhat greater equitable relief available in this APA suit than in a tax refund suit (which there isn't), we have said that "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia*, 563 F.3d at 522 (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. Dep't of Health & Human Services,* 396 F.3d 1265, 1272 (D.C. Cir. 2005)).

is whether the tax refund suit is an adequate forum for plaintiffs to raise their arguments that the 2006 refund rules are unlawful. The answer is yes.[7]

The majority opinion seems to think that, in invoking §§ 703 and 704, we are advancing an exhaustion argument. *See* Maj. Op. at 26-29. We are not. There is a difference between (i) the doctrine requiring exhaustion of *administrative* remedies and (ii) the §§ 703/704 principle that applies when, as here, Congress has provided alternative *judicial* procedures. *Bowen*, 487 U.S. at 903. The Supreme Court in *Bowen* distinguished those two principles. *Id.* at 902-03. The majority opinion here melds them into an undifferentiated stew and then uses administrative exhaustion case law to try to respond to our §§ 703/704 argument. The cases concerning exhaustion of *administrative* remedies are not responsive to our §§ 703/704 argument. The §§ 703/704 question is whether the tax refund suit is the proper *judicial* forum specified by Congress for plaintiffs to raise their claims.[8]

---

[7] The majority opinion cites one case from 1987 in which this Court allowed a suit that might have been brought as a refund suit to proceed under the APA. *See Foodservice & Lodging Inst., Inc. v. Regan*, 809 F.2d 842, 846 (D.C. Cir. 1987). But that case did not address the §§ 703/704 point about alternative judicial procedures specified by Congress. It is therefore obviously not a relevant precedent on the §§ 703/704 issue. *See Arizona Christian School Tuition Organization v. Winn*, 131 S. Ct. 1436, 1448-49 (2011) (conclusion overlooked, not raised, or assumed sub silentio in prior cases is not precedent).

[8] APA §§ 703 and 704 require plaintiffs to bring their claims in tax refund suits; in those tax refund suits, plaintiffs in turn would be statutorily required – absent some legitimate exception to the exhaustion requirement – to first exhaust their administrative remedies. *See* 26 U.S.C. § 7422(a) ("No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected,

In response to this point, the majority opinion relies heavily on *McCarthy v. Madigan*, 503 U.S. 140, 148 (1992), which says that administrative exhaustion sometimes may not be required when a plaintiff challenges the adequacy of the administrative procedures themselves.  Reliance on *McCarthy* simply highlights the majority opinion's confusion about the §§ 703/704 issue and about the distinction between exhaustion of administrative remedies and alternative judicial procedures.  In tax refund suits, plaintiffs can raise all of their arguments – including about the adequacy of the administrative exhaustion requirement that applies in tax refund suits as a result of 26 U.S.C. § 7422(a).  To be very clear and very specific:  Plaintiffs here could try to skip the administrative process altogether and directly file tax refund suits under 28 U.S.C. § 1346(a)(1).  In such tax refund suits, if plaintiffs had not first exhausted their administrative remedies, the IRS no doubt would move to dismiss the suits because of plaintiffs' failure to exhaust pursuant to 26 U.S.C. § 7422(a).  At that point, plaintiffs could raise to the courts their *McCarthy*-based argument that they do not have to exhaust administrative remedies – for example, if they believe

---

or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.").

Contrary to what the Government argues, the § 7422(a) exhaustion requirement would apply not because § 7422(a) itself requires that this APA suit be deemed a tax refund suit preceded by exhaustion of administrative remedies.  Rather, the § 7422(a) exhaustion requirement would apply because §§ 703 and 704 of the APA, in conjunction with 28 U.S.C. § 1346(a)(1), require plaintiffs to bring their claims in tax refund suits, and § 7422(a) in turn requires exhaustion in those tax refund suits.

the exhaustion requirement is unconstitutional.[9]  And the courts considering the refund suits could address plaintiffs' *McCarthy*-based no-need-to-exhaust arguments.  The courts may well reject such attempts to evade the exhaustion requirement.  Even so, the burden of participating in a statutorily imposed exhaustion requirement does not make an alternative judicial forum inadequate for purposes of APA §§ 703/704.  The key point is that in tax refund suits, plaintiffs could raise any complaint they have about the 2006 tax refund rules – including any complaint they have about the exhaustion requirement that attaches to tax refund suits.  Given that undisputed fact, *McCarthy* is no answer to our main point here:  APA §§ 703/704 require dismissal of this APA suit because the tax refund suit is the congressionally specified judicial forum "relevant to the subject matter."  5 U.S.C. § 703.

In sum, the tax refund suit is the proper judicial forum for plaintiffs to raise their complaints about the 2006 refund rules.  Because the tax refund suit is a special statutory judicial review proceeding relevant to the subject matter and because it is an adequate forum, plaintiffs cannot maintain this APA challenge to the 2006 refund rules.

## II

The Government alternatively raises a mix of administrative exhaustion, finality, and ripeness principles in arguing that plaintiffs must file refund claims with the IRS before suing.  *See* Gov't Br. at 54-69.  Those three doctrines are notoriously intermingled.  *See* 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 15.17 (5th ed. 2010) (exhaustion, finality, and ripeness "overlap significantly, and

---

[9] In the two cases *McCarthy* cited in describing this exception, the plaintiffs had argued that the exhaustion requirement was unconstitutional.  *See* 503 U.S. at 148.

. . . are sometimes indistinguishable"); *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731 (D.C. Cir. 1987) (three-judge panel issued three separate opinions for a unanimous conclusion: one based on exhaustion, one based on finality, and one based on ripeness).

We conclude that the ripeness doctrine precludes consideration of plaintiffs' claims at this time and requires plaintiffs to file refund claims with the IRS before suing. (The ripeness bar is separate from and in addition to the APA §§ 703/704 bar that we discussed above.)

"Ripeness is a justiciability doctrine" that is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003). A challenge to an agency regulation is ripe for judicial review where (i) the issue is fit for decision and (ii) delay would impose hardship on the plaintiffs. In the classic formulation, the Supreme Court stated that a claim is ripe where "the legal issue presented is fit for judicial resolution, and where [the] regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 153 (1967).

The principal issue here concerns the second prong of the ripeness doctrine: hardship. Do the 2006 refund rules require, in the words of *Abbott Laboratories*, "an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance?" *Id.* at 153. The answer is obviously no. Unlike a regulation that imposes obligations or prohibits conduct (backed by sanctions), a payment scheme like that established by the 2006 refund rules does not require "an immediate and significant change" in plaintiffs' conduct.

To borrow the words of a recent Supreme Court ripeness decision, the 2006 tax refund procedure "does not command anyone to do anything or to refrain from doing anything; it does not grant, withhold, or modify any formal legal license, power, or authority; it does not subject anyone to any civil or criminal liability; and it creates no legal rights or obligations." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 809 (applying *Abbott Laboratories* and quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)) (alterations omitted). Rather, the refund rules mark a path for taxpayers to obtain money back from the Government. The refund scheme "leaves a [taxpayer] free to conduct its business as it sees fit." *Nat'l Park Hospitality Ass'n*, 538 U.S. at 810. Thus, requiring plaintiffs to challenge the refund rules only after they apply to the IRS for refunds will have "no irremediably adverse consequences" for plaintiffs. *Id.* (alteration omitted).[10]

Moreover, it is well settled that the mere "burden of participating in further administrative and judicial proceedings does not constitute sufficient hardship" for purposes of the ripeness analysis. *AT&T Corp. v. FCC*, 349 F.3d 692, 702 (D.C. Cir. 2003); *see also Ohio Forestry Ass'n*, 523 U.S. at 734-35 (burden of going through additional

_____

[10] *See also Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57-61 (1993) (no hardship in requiring aliens to apply for amnesty under agency's amnesty rules before suing to challenge agency's amnesty rules); *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164-66 (1967) (no hardship where "the impact of the administrative action could [not] be said to be felt immediately by those subject to it in conducting their day-to-day affairs"); *Devia v. NRC*, 492 F.3d 421, 427 (D.C. Cir. 2007) (claim of hardship "insubstantial" when party "not required to engage in, or to refrain from, any conduct"); *Sprint Corp. v. FCC*, 331 F.3d 952, 958 (D.C. Cir. 2003) (no hardship where agency action leaves plaintiff "free to conduct its business as it sees fit" and there are no "adverse effects of a strictly legal kind") (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733).

proceedings is not a sufficient hardship to render an agency action ripe for review); *Nuclear Energy Institute, Inc. v. EPA*, 373 F.3d 1251, 1313 (D.C. Cir. 2004) (requiring party to raise claims in agency and judicial proceedings "works no hardship . . . sufficient to render its claims ripe"); *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1205 (D.C. Cir. 1998) (requiring party to raise claim in agency proceeding is not sufficient hardship for purposes of ripeness); *Florida Power & Light Co. v. EPA*, 145 F.3d 1414, 1421 (D.C. Cir. 1998) ("The only conceivable hardship Florida P&L will endure as a result of postponement is the burden of participating in further administrative and judicial proceedings. Such claims, however, do not constitute sufficient hardship for the purposes of ripeness."). Here, therefore, the burden of filing a refund claim with the IRS before suing does not constitute sufficient hardship for purposes of the *Abbott Laboratories* ripeness inquiry.

Plaintiffs and the majority opinion suggest that it would be easier to mount one APA challenge rather than a series of individual tax refund suits. *See* Maj. Op. at 26, 29. But as the Supreme Court has explained in a similar context, that theory "does not explain . . . why one initial site-specific victory (if based on the Plan's unlawfulness) could not, through preclusion principles, effectively carry the day. And, in any event, the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe." *Ohio Forestry Ass'n*, 523 U.S. at 734-35 (citation omitted); *see also Clean Air Implementation Project*, 150 F.3d at 1206. The Supreme Court has stated that the "case-by-case approach that this requires" is "the traditional, and remains the normal, mode of operation of the courts." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

Put simply, the general ripeness principle that emerges from the case law and that governs here is this: When an

agency rule prohibits conduct backed by sanctions or imposes an obligation backed by sanctions, an aggrieved party often may challenge the rule immediately and need not wait to challenge it in its defense to an enforcement action after violating the rule. The rationale is that a party should not be forced into the "dilemma" of violating an allegedly unlawful rule and risking a heavy sanction "if they've guessed wrong and the rule is upheld in the penalty proceeding." *Abbs v. Sullivan*, 963 F.2d 918, 926 (7th Cir. 1992) (internal citations omitted); *see also Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 (1993) (describing this "dilemma"). By contrast, as the Supreme Court decided in *Reno v. Catholic Social Services*, when an agency rule establishes criteria for an individual to obtain money or a benefit of some kind from the government, a party must first apply to the government for the money or benefit before bringing suit to challenge the agency rule. *See* 509 U.S. at 57-61. Requiring a party to apply for the money or benefit before suing to challenge the agency rule does not pose the *Abbott Laboratories* "dilemma" because the party will not face any sanctions if the rule is ultimately upheld.[11]

Allowing this APA suit to go forward at this time is flatly inconsistent with the ripeness principles articulated in cases such as *Abbott Laboratories*, *Reno v. Catholic Social Services*, and *National Park Hospitality Association*. Plaintiffs must file a refund claim with the IRS before bringing suit.

---

[11] Professor Pierce has described the Court's ripeness jurisprudence as precluding "pre-application judicial review of any rule that purports to describe criteria for obtaining any form of government benefit, e.g., social security, veterans benefits, any license, or exemption from any regulatory obligation." 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 15.14 (5th ed. 2010).

It is true that our Court – albeit not the Supreme Court – has sometimes permitted judicial review when an issue was fit for resolution, notwithstanding a lack of hardship to the plaintiffs from waiting, so long as there were "no significant agency or judicial interests militating in favor of delay." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 465 (D.C. Cir. 2006) (quoting *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 756-57 (D.C. Cir. 2003); *see also Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004) ("The hardship prong under the ripeness doctrine is largely irrelevant in cases . . . in which neither the agency nor the court have a significant interest in postponing review."); *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003) ("where there are no institutional interests favoring postponement of review, a petitioner need not satisfy the hardship prong"); *Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C. Cir. 1995) ("there is no need to consider the hardship to the parties of withholding court consideration, [where] there would be no advantage to be had from delaying review") (internal quotation marks and citation omitted).

But here, there are "significant agency or judicial interests militating in favor of delay." *Nat'l Ass'n of Home Builders*, 440 F.3d at 465. Those interests are some of the very interests that are protected by the ripeness doctrine: the courts' interest in not "entangling themselves in abstract disagreements over administrative policies," and the IRS's interest in being protected from "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories*, 387 U.S. at 148-49; *see also Ohio Forestry Ass'n*, 523 U.S. at 735-37. For example, plaintiffs claim that it was too difficult for taxpayers to gather the paperwork needed to justify a claim for more than the standard refund amount. That is precisely the kind of claim where court review would benefit from prior agency application and

analysis. Indeed, if the agency agreed with a taxpayer's argument on that issue, there would be no need for judicial involvement at all. Also, plaintiffs claim that the IRS did not provide adequate notice of the refund procedure. That too is the kind of claim where judicial resolution would benefit from a considered agency analysis of the design and limitations of the notification process.

In any event and perhaps more to the point, we don't need to guess how the *Abbott Laboratories* test applies to the kind of agency rule at issue here. The Supreme Court has told us how – in cases such as *Reno v. Catholic Social Services* and *National Park Hospitality Association.* Those cases stand for the proposition that pre-application challenges to rules that set forth criteria for government payments or benefits are not ripe.

\* \* \*

Under the APA, plaintiffs must file tax refund suits to raise their complaints about the 2006 refund rules. Alternatively, the ripeness doctrine precludes plaintiffs from suing until after they file refund claims with the IRS. For either of those two alternative and independent reasons, plaintiffs' APA suit should be dismissed.[12] We respectfully dissent.

---

[12] In arguing that we should not entertain plaintiffs' APA claim now, the Government also raises yet another alternative argument: that the Declaratory Judgment Act and the Anti-Injunction Act together bar APA suits challenging IRS refund rules. That argument raises extremely difficult issues of statutory interpretation, as the panel opinions in this case explored. But that statutory question ultimately is not necessary to our resolution of the case because §§ 703/704 of the APA and the ripeness doctrine each independently bar this suit. The majority opinion chides us for not addressing the additional statutory issue regarding the Declaratory Judgment and Anti-Injunction Acts. *See* Maj. Op.

at 11. Having found two separate and independent bars to plaintiffs' suit, we see no need to consider the several other objections raised by the Government. Of course, in order to allow this suit to go forward, the majority opinion by contrast must consider and reject *each* of the Government's objections. That's why the majority opinion needs to address the statutory issue regarding the Declaratory Judgment and Anti-Injunction Acts, and we do not.