# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Filed April 6, 2012

No. 10-1031

LEPAGE'S 2000, INC. AND LEPAGE'S PRODUCTS, INC.,
PETITIONERS

v.

POSTAL REGULATORY COMMISSION,
RESPONDENT

Consolidated with 10-1033, 10-1279, 10-1294

On Petitioners' Motion for Attorneys' Fees

Before SENTELLE, *Chief Judge*; GRIFFITH, *Circuit Judge*; and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed *PER CURIAM*.

*PER CURIAM*: In *LePage's 2000, Inc. v. Postal Regulatory Commission*, 642 F.3d 225 (D.C. Cir. 2011), we vacated an order of the Postal Regulatory Commission and remanded the case for further proceedings consistent with our opinion. We now consider a petition by LePage's 2000, Inc. and LePage's Products, Inc., for attorneys' fees and expenses incurred in the litigation leading up to our decision. Because we find that the

Commission was not substantially justified in issuing its order, but that fees and expenses requested for proceedings before the Commission are not reimbursable, we award a portion of the fees and expenses sought in the petition for reasons more fully set forth below.

**Background**

Details of the factual background of this controversy can be found in *LePage's 2000, Inc. v. Postal Regulatory Commission*, 642 F.3d 225 (D.C. Cir. 2011), and *USPS v. Postal Regulatory Commission*, 599 F.3d 705, 706 (D.C. Cir. 2010). To summarize: In 2006 Congress passed the Postal Accountability and Enhancement Act ("the PAEA" or "the Act"), Pub. L. No. 109-435, 120 Stat. 3198 (2006), which limited the ability of the United States Postal Service ("the Service" or "the USPS") to engage in nonpostal services. The Act created the Postal Regulatory Commission ("the PRC" or "the Commission"), which could approve for continuation of a nonpostal service if the Commission concluded that there was a public need for the service and the private sector could not meet the public need for the service. In carrying out its mission, the PRC divided its proceedings into two parts, Phase I and Phase II. During Phase I the Service argued that several of its programs should be classified as postal services and therefore permitted to continue. One of these was the ReadyPost program, in which the USPS sells USPS-branded shipping supplies in postal retail locations. The PRC agreed that this was a postal service and therefore could continue. Also during Phase I the Service sought to have several nonpostal services continue. One of these was a program in which the Service sells licensee-made USPS-branded and USPS-themed products, such as teddy bears and scales, at USPS retail locations ("the Bears and Scales program"). The Commission found that this service could continue because the private sector could not meet the public

need for these items as only the Service could provide the Service's intellectual property to manufacturers. During Phase I the Commission also looked at the Service's commercial licensing program in general. The Commission determined that as a general matter the commercial licensing program could continue because it served a public need by generating revenues for the Service, benefitted mailers, and promoted and gave recognition to the Service's brand. The Commission noted, however, that this determination was not unqualified.

The Commission then commenced Phase II, during which it more closely examined the commercial licensing program. In particular, the Commission looked at the commercial license held by LePage's 2000, Inc. and LePage's Products, Inc. ("LePage's") to sell USPS mailing and shipping supplies (bubblewrap, for example) that bore the USPS brand at non-USPS retail locations ("the Bubblewrap program"). The Commission found that there was no public need for the Bubblewrap program and that the USPS had failed to demonstrate that the private sector was unable to meet any public need for the program. The PRC ordered the USPS to terminate the Bubblewrap program. The USPS and LePage's appealed the Commission's Phase II order to this court.

In *LePage's 2000, Inc.*, we vacated the Commissions's Phase II order and remanded the case to the PRC. 642 F.3d 225. We stated that the Commission's order was "rife with anomalies, any one of which is sufficient to justify a remand, and all of which, when considered together, demonstrate the Commission was proceeding in a slapdash manner." *Id.* at 230-31. We went on to state that it was "untenable" that the ReadyPost program was considered a postal service but the Bubblewrap program was not, when both programs fostered use of the mail and enhanced consumers' convenience. *Id.* at 231. We remanded the Phase II order to the Commission to, *inter*

*alia*, adopt a reasoned rationale if it intended to continue classifying the Bubblewrap program as a nonpostal service. *Id.*

We also reviewed the Commission's conclusion that there was no public need for the Bubblewrap program. We found that the Commission's determination, that any benefits of the Bubblewrap program were outweighed by the disadvantages of selling USPS-branded products that could confuse consumers and disrupt markets, was flawed. In making this determination, we noted that in its Phase I order the Commission determined that for various reasons commercial licensing as a general matter served a public need, but in its Phase II order noted these reasons were without sufficient evidentiary support for the Bubblewrap program. We further noted that the Commission in Phase I did not distinguish between different types of commercial licensing, and that the Commission did not explain how it could read the same evidence differently when applied to different aspects of the same program. *Id.* at 232.

Also concerning the Commission's conclusion that there was no public need for the Bubblewrap program, we noted that the Commission had found a public need for the Bears and Scales program because that program leveraged the Postal Service's brand and helped support its core mission. We then stated that we did "not understand why these same benefits would not accrue to the Bubblewrap program, which aside from the seller's identity, is substantially similar to the Bears and Scales program." We further stated that at the least the Commission must explain this differential treatment of seemingly like cases. *Id.*

Finally, we reviewed the Commission's holding that the private sector could meet any public need for the Bubblewrap program. We noted that in Phase I the Commission held that licensing could not be met by the private sector because no other

entity other than the Service could license its intellectual property, but then in Phase II explained that other entities were able to provide substitutes for the licensed mailing and shipping products. We further noted that the Commission offered no reason for this departure, and stated that we did not see how the Commission could adopt the position it did in its Phase II order. *Id.* at 233. At the end of the decision, we found the Phase II order arbitrary and capricious, and stated that the Commission had "much work to do on remand remedying the abundant inconsistencies in its order." *Id.* at 234.

LePage's now petitions for an award of attorneys' fees and expenses in the amount of $143,693.49, relating both to the litigation in this court and to the underlying administrative proceedings. LePage's seeks the award under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) ("EAJA"), which provides in pertinent part that attorneys' fees and expenses shall be awarded to a "prevailing party . . . unless the court finds that the position of the United States was substantially justified." In its brief LePage's argues that it was the "prevailing party" in this case and that the position of the PRC was not substantially justified. In its opposing brief the PRC agrees that LePage's was the prevailing party but argues that the PRC was substantially justified in its position and consequently LePage's is not entitled to any award of attorneys' fees. The PRC further argues that even if this court finds its position to not be substantially justified, under the EAJA, LePage's is not entitled to fees in the amount of $41,028.76 incurred in the underlying administrative proceedings. The PRC also states that if the court disagrees with these positions, the PRC does not contest the amount of fees requested.

6

**Discussion**

The Equal Access to Justice Act, 28 U.S.C. § 2412(d), states in pertinent part:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). Our first task in deciding whether LePage's meets the requirements of the EAJA is an easy one: we must determine whether fee petitioner LePage's is a "prevailing party." LePage's argues, and the PRC does not dispute, that our disposition in *LePage's* establishes that LePage's is a prevailing party within the meaning of the EAJA. We agree. In *LePage's* we found the PRC's Phase II order arbitrary and capricious, vacated it, and remanded the case for further proceedings. 642 F.3d at 234. We conclude that LePage's is a prevailing party for purposes of the EAJA.

Our next task is somewhat more difficult: we must determine whether, pursuant to the EAJA, the position the United States (the PRC) took during the litigation was "substantially justified." The Supreme Court has explained that the most naturally conveyed connotation of the phrase "substantially justified" is "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quotation marks omitted). As already noted, in *LePage's* we

found the PRC's Phase II order arbitrary and capricious. Such a finding, however, does not necessarily mean that the United States' position was not substantially justified. *See FEC v. Rose*, 806 F.2d 1081, 1087 (D.C. Cir. 1986) (in discussion of 'substantially justified' standard, court stated that "a finding in the merits phase that the Government's underlying action was 'arbitrary and capricious'. . . does not compel an award of fees" under the EAJA). The court in *Rose* implied that, when considering whether conduct is substantially justified, we should look to the *reason* the agency action was invalidated as arbitrary and capricious. The court went on to give two examples in which it may be difficult to demonstrate that an agency's arbitrary and capricious actions are substantially justified: "an agency's unjustifiably disparate treatment of two similarly situated parties works a violation of the arbitrary-and-capricious standard"; and "an agency's failure to apply a rule in a situation to which the rule obviously pertains." 806 F.2d at 1089. Furthermore, in *Hill v. Gould*, 555 F.3d 1003 (D.C. Cir. 2009), we noted that although we had previously found the particular decision of the Secretary of the Interior at issue to be arbitrary and capricious, *see Hill v. Norton*, 275 F.3d 98 (D.C. Cir. 2001), that decision did not "suffer from the defects common to positions that are not substantially justified"; i.e., it was neither "flatly at odds with controlling case law," nor "in the face of an unbroken line of authority." 555 F.3d at 1008 (quotation marks omitted).

We note that "[t]he Government has the burden of proving that its position . . . was 'substantially justified' within the meaning of the Act." *Halverson v. Slater*, 206 F.3d 1205, 1208 (D.C. Cir. 2000). In arguing that its position was substantially justified, the PRC begins with the standards set forth in *Rose* and *Hill*. Citing *Hill*, the PRC claims that its position was neither "flatly at odds with controlling case law" nor "in the face of an unbroken line of authority." The PRC argues instead that the

Phase I and Phase II proceedings constituted the only time that any agency or court interpreted the portion of the Act at issue. And concerning the standards set forth in *Rose*, the PRC contends that in this case it never treated similar parties differently or failed to apply a rule to a situation where the rule obviously pertains.

The PRC argues that instead it was substantially justified in distinguishing programs based on the identity of the seller as well as the nature of the products at issue. First, the PRC notes that it distinguished the ReadyPost program from the Bubblewrap program by who was making the sale, i.e., the Postal Service for the ReadyPost program and private parties for the Bubblewrap program. The PRC argues that it was substantially justified in making this distinction because during Phase I it had been determined that the ReadyPost program was a postal service and the commercial licensing program (i.e., the Bubblewrap program) a nonpostal service. Furthermore, argues the PRC, it was also substantially justified in distinguishing the Bubblewrap program from the Bears and Scales program based on the identity of the seller, because any impression that the Postal Service stands behind its products would be stronger with respect to products that the Postal Service sells itself. Second, the PRC notes that it focused on the nature of the products at issue when it distinguished between licensing for products related to Postal Service operations and licensing for purely promotional products. The PRC argues that it was substantially justified in making this distinction as well because licensing agreements in and of themselves have little effect on the public, and instead it is the licensee's marketing of a product bearing the Postal Service's brand that serves the public at large.

Although the PRC argues forcefully that its positions were substantially justified, we cannot agree. In our discussion in *LePage's* of the PRC's argument distinguishing programs based

on the identity of the seller, we first noted not only that the PRC "did not set [the argument] forth below" but also that the argument was "inconsistent with the position it took below." 642 F.3d at 231. Furthermore, we noted that distinguishing programs based on the rationale the PRC offered below was "untenable." *Id.* Next, in our discussion of the PRC's conclusion that there was no public need for the Bubblewrap program, we stated that the PRC's assessment of the benefits of the Bubblewrap program was "flawed" in that the PRC had determined that commercial licensing served a public need but that the Bubblewrap program, a commercial licensing venture, did not. *Id.* at 232. We further stated that we did not understand how the PRC could find a public need for the Bears and Scales program but not the Bubblewrap program when the programs were substantially similar. *Id.* We noted that the PRC's assessment of public need in its Phase II order departed from its Phase I order, and that this change had happened "subtly, and without explanation." *Id.* at 233. Finally, we agreed that in its Phase II order the PRC had "departed without explanation from its Phase I conclusion that the private sector could not possibly meet the public need for commercial licensing." We went on to state that we did not "see how the [PRC] could adopt the position it does in its Phase II order." *Id.* Taking all of the above into consideration, we found "[t]he Commission's order [] rife with anomalies," all of which demonstrated that the Commission "proceed[ed] in a slapdash manner." *Id.* at 230-31. All in all, we concluded that the Phase II order was "arbitrary and capricious," and remanded the order to the Commission stating that "[t]he Commission has much work to do on remand remedying the abundant inconsistencies in its order." *Id.* at 234 & n.7. Consequently, we cannot conclude that the PRC's position was substantially justified.

* * * * * * * * *

Having determined that under § 2412(d)(1)(A) of the EAJA LePage's is entitled to an award of attorneys' fees because it was the "prevailing party" and the PRC was not "substantially justified" in its position, we must next determine the *amount* to which LePage's is entitled. To begin, LePage's has requested a total award of $143,693.49, of which $41,028.76 is for fees paid in connection with proceedings before the PRC wherein the PRC required LePage's to discontinue the Bubblewrap program. The PRC argues that even if we find that the PRC's position was not substantially justified (as we have), LePage's is only entitled to fees incurred in connection with proceedings before this court and not to the $41,028.76 in fees incurred in connection with proceedings before the PRC. We agree.

It is true, as LePage's argues, that the EAJA provides for recovery of fees and other expenses in the context of an administrative proceeding, but only in the case of "an adversary adjudication." 5 U.S.C. § 504. The Act defines "adversary adjudication" as "an adjudication under section 554 of this title." Section 554 ("Adjudications") of title 5 provides that "[t]his section applies . . . in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing . . . ." The upshot is that whether LePage's may recover fees incurred during the proceedings before the PRC depends on whether those proceedings meet this definition of an "adversary adjudication." The proceedings before the PRC were governed by 39 U.S.C. § 404 (e)(3), which requires that the PRC "review each nonpostal service offered by the Postal Service on the date of enactment of that Act and determine whether that nonpostal service shall continue." The section does not require a "hearing," and consequently the proceedings before the PRC would not appear to meet the above definition of an "adversary adjudication." LePage's nevertheless argues that because the PRC's enabling statute, 39 U.S.C. § 503, states that the PRC "shall promulgate rules and regulations and establish

procedures, subject to chapters 5 and 7 of title 5," then Congress intended that proceedings conducted by the PRC be governed by, *inter alia*, § 554 and its formal adjudication procedures. But the fact that the PRC's enabling statute says that the PRC shall establish procedures subject to chapter 5 of title 5 is irrelevant because generic provisions of chapter 5 may apply even if the formal adjudication procedures in § 554 do not. We conclude that the proceedings before the PRC do not meet the above definition of an "adversary adjudication," and LePage's is therefore not entitled to the $41,028.76 in fees incurred in connection with those proceedings.

Deducting the amount of $41,028.76 from the total amount requested, $143,693.49, leaves $102,664.73. Other than the argument that its position was substantially justified, the PRC does not contest this amount. Accompanying LePage's petition for attorneys' fees are detailed billing records of the time spent by LePage's attorneys on the matter. LePage's states that before submission to us the records were reviewed and any fees ineligible for reimbursement removed. We have also reviewed the records for any fees not reimbursable, for example those incurred for unnecessary travel, duplication of effort and media relations. Finding none, we conclude that LePage's is entitled to an attorneys' fees award in the amount of $102,664.73.

## Conclusion

For the reasons set forth above, we hold that the petition for attorneys' fees be granted in part in the amount of $102,664.73.